IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

TINA L. P.[1]                              )
                                           )
                    Plaintiff,             )
                                           )
vs.                                        )      Case No. 17-cv-00938-CJP[2]
                                           )
ACTING COMMISSIONER OF SOCIAL              )
SECURITY,                                  )
                                           )
                    Defendant.             )

## **MEMORANDUM and ORDER**

In accordance with 42 U.S.C. § 405(g), plaintiff Tina L. P. (Plaintiff) seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

### **Procedural History**

Plaintiff applied for DIB on November 4, 2013, alleging a disability onset date of July 30, 2013. (Tr. 162-63). Plaintiff's application was denied at the initial level and again upon reconsideration. (Tr. 81, 99). Plaintiff requested an evidentiary hearing, (Tr. 159), which Administrative Law Judge (ALJ) Stephen Hanekamp conducted on May 25, 2016, (Tr. 41-65). The ALJ reached an unfavorable determination on October 3, 2016. (Tr. 8-30). The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final agency

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order in order to protect his privacy. See FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c). See Doc. 25.

decision. (Tr. 1-7). Plaintiff exhausted her administrative remedies and filed a timey complaint with this Court. (Doc. 1).

**Issues Raised by Plaintiff**

Plaintiff contends the ALJ erroneously determined what impairments were "severe" and improperly considered the evidence in determining her residual functional capacity.

**Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled, which means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an

alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v.*

*Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).  *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405(g).  Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  See *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).  This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v.*

*Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The ALJ's Decision

ALJ Hanekamp found Plaintiff met the insured status requirements through December 31, 2019 and had not engaged in substantial gainful activity since July 30, 2013, the alleged onset date. (Tr. 13). Plaintiff had severe impairments of degenerative disc disease, meniscal tear of the left knee, fibromyalgia, depression, anxiety, and personality disorder. (Tr. 14). The ALJ opined Plaintiff had the RFC to perform light work with several additional limitations. (Tr. 17). Plaintiff's RFC precluded her from performing past relevant work, buts she was not disabled because other jobs existed that Plaintiff could perform. (Tr. 23-24).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

### 1. Agency Forms

In her agency forms, Plaintiff indicated that the following conditions limited her ability to work: fibromyalgia; chronic depression; insomnia; a thyroid condition; head, back, and neck injuries; irritable bowel syndrome; high blood pressure; and anxiety. (Tr. 188). She experienced constant pain "from head to

toe" and took prescription pain medications, including, Roxicodone, Tramadol, and Diclofenac. The medications helped her cope with the pain but did not completely relieve her symptoms. They also made her drowsy and dizzy. Plaintiff alleged she could not sit or stand very long and felt pain with stretching, bending, and lifting. Consequentially, she had difficulty cooking, cleaning, shopping, sleeping, and taking care of personal needs. She could make microwavable meals and sandwiches and wash laundry and dishes. Her hobbies and social activities included reading, watching television, browsing Facebook, talking with friends, and playing cards. Plaintiff also struggled with mental illness and had suicidal tendencies. She was always irritable and tired. She handled stress "OK" and was "good" at handling changes in routines. (Tr. 204, 217-24, 241).

## 2. Evidentiary Hearing

ALJ Hanekamp conducted an evidentiary hearing in May 2016. Plaintiff testified that she engaged in self-harm such as repeatedly punching herself. She most recently harmed herself two weeks before the hearing. (Tr. 49). She estimated she inflicted injury on herself about 15 or 20 times. She pounded her head on the wall, hit herself in the head with a piece of metal, burned herself, or cut herself. She has also run in front of a bus a couple of times and pulled her hair out. (Tr. 51).

Plaintiff's mental impairments affected her on a daily basis. She had problems focusing, got angry, and thought about harming herself and others. She previously committed herself to the hospital when she had harmful thoughts.

About four times each month she isolated herself and did not get out of bed. (Tr. 52). Plaintiff did not notice an improvement in her condition. In fact, she said that thoughts of hurting herself were getting worse. (Tr. 53).

### 3. Medical Records

Plaintiff received primary care from Dr. Chris Mbaeri at Family Choice Medical Clinic during part of the relevant period. On August 16, 2013, Dr. Mbaeri diagnosed Plaintiff with anxiety and prescribed her Xanax. (Tr. 457).

On September 3, 2013, Plaintiff followed up with Dr. Mbaeri and reported increased psych-socioeconomic stressors resulting in homelessness, worsening anxiety, and a suboptimal appetite. Dr. Mbaeri refilled her Xanax prescription. (Tr. 456).

Plaintiff presented to Dr. Alka Aggarwal at Belleville Family Health Center on January 30, 2014. Plaintiff stated she was unemployed, homeless, very anxious, and using Xanax to get through her days. Dr. Aggarwal wrote the following:

> [Patient] wants her Xanax and that is all that she wants; she threatened suicide when I told her I can't give it to her until her [drug screen] is negative; I told her if she is suicidal then I need to call 911 to admit her to the hospital, she rolled her eyes and said she is not suicidal; she threatened to leave in the middle of the appointment a few times as well . . .

On psychiatric examination, Plaintiff was oriented to time, place, person, and situation. She was anxious, had normal knowledge and language, and denied hallucinations and hopelessness. Dr. Aggarwal noted poor insight and judgment and pressured speech. Plaintiff did not have suicidal ideations. Dr. Aggarwal prescribed Plaintiff Xanax with no refills and started her on Celexa. Dr. Aggarwal

gave Plaintiff hydroxyzine for anxiety and discussed non-pharmaceutical methods of reducing her anxiety. (Tr. 474-77).

Plaintiff presented to Dr. Mbaeri on February 28, 2014 and reported anxiety and insomnia. He refilled Plaintiff's medications. (Tr. 490).

Plaintiff underwent a mental status examination on March 18, 2014 with state-agency consultant Dr. John Oshodi. Plaintiff told Dr. Oshodi that her father physically, emotionally, and sexually abused her until she was 13. One of her sisters had a child by her father and another "sister and him used to have sex." She sought counseling in adulthood for the abuse. Plaintiff reported a long history of depression resulting from her childhood and a lifestyle consisting of drug abuse and homelessness. She began using alcohol, opium, marijuana, cocaine, mushrooms, acid, and hashish between the ages of 8 and 12. Around the age of 45, she began abusing crack cocaine and molly. She most recently used cocaine about one and a half weeks prior to the examination and crack cocaine and molly about six months prior to the examination. She also reported a long history of hearing voices and seeing things. Plaintiff was involuntarily committed in the past and, as early as July 2012, expressed suicidal thoughts. (Tr. 484).

On examination, Plaintiff maintained adequate eye contact and was oriented to place, person, and time. She displayed facial expressions and emotions of anger, worry, and sadness. She exhibited signs of frustration and stated, "Nobody wants to hire me because I'm overqualified. I should not have been born." Plaintiff's overall affect was irritable and congruent with her depressed mood.

She had a clear and coherent speech pattern and quality of thinking, but an angry intonation. She denied suicidal and homicidal ideations but reported ongoing hallucinatory experiences. Her overall thought process and content were logical. She responded to questions in a goal-directed manner. Plaintiff had poor concentration and attention. Her angry emotions and behaviors easily distracted her. Plaintiff was only able to repeat five digits forward and four digits backward. She could perform calculations. Her recent memory was poor and she could only recall two of six words after a five-minute interval. Her remote memory was adequate, her insight and judgment were fair, and her overall attitude was cooperative. (Tr. 486).

Dr. Oshodi diagnosed Plaintiff with polysubstance dependence; mood disorder due to medical conditions, with depressive features; impulse control disorder NOS; psychotic disorder NOS; and coping and residential difficulties. Plaintiff's GAF score was 53. (Tr. 486-87).

Dr. Oshodi opined Plaintiff's ability to perform domestic activities of daily living was fair but her ability to adequately perform work activities and fully function under pressure was "highly limited as evidenced by her indicated difficulties marked with irritability, low frustration tolerance, angry emotions, and drug abuse." He opined Plaintiff would benefit from financial management assistance. (Tr. 487).

On March 25, 2014, state-agency consultant Dr. Ellen Shapiro conducted a records review and opined Plaintiff had mild restrictions in her ability to perform

activities of daily living and moderate difficulties maintaining social functioning, concentration, persistence, and pace. (Tr. 71-73).

On March 27, 2014, Plaintiff followed-up with Dr. Mbaeri and complained of anxiety and depression. He advised Plaintiff to continue taking Xanax. (Tr. 489).

On May 15, 2014, state-agency consultant Dr. James Brown conducted a records review and opined Plaintiff had mild restrictions in her ability to perform activities of daily living and moderate difficulties maintaining social functioning, concentration, persistence, and pace. (Tr. 88-90).

Plaintiff presented to Dr. Sarah Gebauer at Belleville Family Health Center on September 12, 2014 for a drug screen. Dr. Gebauer noted that Plaintiff's anxiety and depression were "very poorly controlled on a questionable regimen." Plaintiff reported difficulty with functioning and concentrating, anxious and fearful thoughts, problems falling and staying asleep, depressed mood, fatigue, feelings of guilt, restlessness, thoughts of death and suicide, excessive worry, and paranoia. On examination, Plaintiff was oriented to time, place, person, and situation and demonstrated an appropriate mood and affect. Dr. Gebauer started Plaintiff on Zoloft and Temazepam and referred her to counseling. (Tr. 719-22).

Plaintiff received primary care from Dr. Jacqueline Aregood at Belleville Family Health Center, beginning on January 6, 2015. Plaintiff reported trouble with sleep and impulse control and experiencing low mood, irritability, and emotionally lability. On mental status examination, Dr. Aregood noted Plaintiff

was well groomed, clean, and of normal weight. She was cooperative, calm, and made eye contact. Plaintiff's speech was fluent, clear, and of normal volume. She did not have any hallucinations. Plaintiff was oriented to situation, time, place, and person and her memory was intact. She demonstrated an average intelligence and euthymic mood. Her affect was pleasant and congruent to thought content. Her insight, judgment, and though processes were intact. She had no suicidal or homicidal ideations or psychosis. Her thought content was unremarkable and her motor activity was intact. Dr. Aregood assessed Plaintiff with depressive disorder and prescribed her Remeron for sleep, anxiety, and mood. (Tr. 598-601).

Plaintiff followed-up with Dr. Aregood on February 3, 2015. She continued to experience chronic symptoms of depression. Plaintiff stated she had crying spells and anxiety attacks. She had passive suicidal ideations the previous few weeks and was still not sleeping well. Plaintiff's mental status examination was unremarkable. Dr. Aregood increased Plaintiff's Remeron and Effexor and encouraged her to participate in therapy. (Tr. 594-97).

Plaintiff saw Dr. Aregood on March 3, 2015. She stated she had some passive suicidal ideations after her boyfriend recently assaulted her. She was "a little better" at the time of the appointment but still had chronic symptoms of depression. Plaintiff was sleeping well. Plaintiff's mental status examination was unremarkable. Dr. Aregood increased Plaintiff's Effexor dosage. (Tr. 591-93).

Plaintiff began seeing licensed clinical professional counselor Amanda Woollard on March 25, 2015. Plaintiff reported moderate depression, difficulty concentrating, fatigue, dramatic changes in her appetite, weight loss, suicidal ideations, and sleep disturbances. She denied hallucinations and delusions. She felt like she was not benefitting much from her medications. Ms. Woollard identified treatment goals, including increasing day-to-day functioning and compliance with her medication regimen. (Tr. 588-90).

Plaintiff followed-up with Dr. Aregood on April 1, 2015. Her depression was in partial remission but she was still troubled by some chronic symptoms, including a depressed mood, irritability, anhedonia, sleep disturbances, and emotional lability/mood swings. Plaintiff's mental status examination was unremarkable. Dr. Aregood switched Plaintiff from Effexor to Cymbalta and advised her to continue therapy. (Tr. 584-87).

Plaintiff saw her counselor, Ms. Woollard, on April 8, 2015 and discussed her goals. She was experiencing stress and had difficulty relaxing. (Tr. 581-83).

Plaintiff followed-up with Ms. Woollard on April 22, 2015. She said things were not going very well for her. She felt discouraged and experienced stress. She admitted to hitting herself in the head when she was frustrated and getting into physical altercations with her boyfriend. (Tr. 578-79).

On May 5, 2015, Plaintiff told Ms. Woollard she was still having panic attacks. She presented with a bruise under her left eye but said she was working on efforts to reduce conflict with her boyfriend. (Tr. 576-77).

Plaintiff saw Dr. Aregood on May 5, 2015. She felt chronic symptoms of depression and anxiety, such as irritability, sleep disturbances, suicidal thoughts, and mood swings. However, she felt like Cymbalta was helping. Plaintiff's mental status examination revealed a flat affect but was otherwise unremarkable. Dr. Aregood increased Plaintiff's dosage of Cymbalta. (Tr. 572-75).

Plaintiff called Dr. Aregood's office on May 6, 2015 and stated she was having panic attacks all day. She requested Dr. Aregood prescribe her Xanax. (Tr. 533).

Plaintiff participated in therapy with Ms. Woollard on May 19, 2015. She continued to feel stress and was tearful as she described her feelings. On mental status examination, Plaintiff's mood was sad and her affect was sad, tearful, and flat. Plaintiff and Ms. Woollard discussed ways for Plaintiff to handle her problems through assertive communications and reaching out to social service agencies. (Tr. 569-71).

Plaintiff saw Dr. Aregood on June 10, 2015. She was sleeping better but still reported sleep disturbances. She presented with physical injuries on her face and knee, which resulted from a fight with her boyfriend. She punched herself in the face during the altercation. Plaintiff reported symptoms of anxiety, depression, and panic, including suicidal thoughts, more than 15 panic attacks in the previous three months, palpitations, fears of dying, and sweating. Plaintiff's affect was flat but the mental status examination was otherwise unremarkable. (Tr. 565-68).

Plaintiff followed-up with Ms. Woollard on June 12, 2015 and said things had been stressful. Her affect was sad, tearful, and flat. She thought about going to the hospital. (Tr. 660-62).

Plaintiff saw Ms. Woollard on June 26, 2015 and reported things were "calmer." Her mental status examination was normal. She denied thoughts of self-harm and reported a better mood. (Tr. 658-60).

Plaintiff saw Ms. Woollard on June 12, 2015. She had a sad, tearful, and flat affect. (Tr. 562-64).

Plaintiff followed-up with Dr. Aregood on July 7, 2015. She thought Cymbalta was helping her mood, but she was still troubled by chronic symptoms of depression and anxiety. Her mental status examination was normal. (Tr. 653-56).

Plaintiff followed-up with Dr. Aregood on August 26, 2015. She felt Cymbalta was helping her mood but she continued to experience chronic symptoms of anxiety and depression. For instance, Plaintiff was fearful, depressed, anxious, nervous, and had sleep disturbances and panic attacks. The mental status examination revealed a flat and constricted affect. Dr. Aregood changed Plaintiff's prescription for Ativan to Klonapin because Plaintiff felt Ativan was not strong enough. (Tr. 547-51).

Plaintiff saw Ms. Woollard on August 26, 2015. She reported that things had been more difficult and stressful over the past several weeks. On mental status examination, Plaintiff's affect was flat and constricted. She missed the

previous therapy session because she was hospitalized for having thoughts about harming herself and her boyfriend. (Tr. 544-46).

Plaintiff followed-up with Dr. Aregood on September 23, 2015. She reported having suicidal ideations the previous month. She felt like Cymbalta was helping but she still experienced symptoms of depression and anxiety. Plaintiff also felt like the Ativan was not strong enough. Plaintiff's affect was flat and constricted on mental status examination. Dr. Aregood switched her to Klonopin, started her on Seroquel, and discontinued her Vistaril. Dr. Aregood also diagnosed Plaintiff with personality disorder. (Tr. 539-43).

Plaintiff switched therapists on September 23, 2015 and began seeing Jessica Epperson. Plaintiff reported symptoms of anxiety and depression, including panic attacks, irritability, restless thoughts, worry, problems sleeping, depressed mood, fatigue, feelings of worthlessness, feelings of hopelessness and suicidal thoughts. She said she hit herself and hit her head into a wall since the last visit, out of anger. She felt like "she would like to no longer be here but has no plans or intent on ending her life." On mental status examination, Plaintiff was agitated, her mood was irritable, and her affect was anxious and sad. (Tr. 640-43).

Plaintiff saw Ms. Epperson on January 8, 2016. Plaintiff reported things had been more difficult over the past several weeks with an increase in symptoms. She had some episodes of self-harm due to inappropriate guilt and feelings of loneliness. She denied suicidal and homicidal ideations. She struggled with daily

chronic pain. On mental status examination, Plaintiff had an anxious affect. Ms. Epperson discussed strategies to manage distress, including engaging in positive activities. (Tr. 633-36).

Plaintiff followed-up with Dr. Aregood on January 13, 2016. She had not sought treatment for a while because she lost her insurance. Plaintiff reported feeling better, calmer, and content. She did not have thoughts of self-harm since starting her medications but still had trouble sleeping at night. Plaintiff continued to report symptoms of depression and anxiety, including panic attacks, sleep disturbances, irritability, and anticipatory fears. Plaintiff's mental status examination was normal. Dr. Aregood restarted Plaintiff on Vistaril for insomnia. (Tr. 629-33).

Plaintiff saw Ms. Epperson on February 5, 2016. She had been doing "OK" since the last session but continued to struggle with anxiety symptoms. She had a decrease in panic episodes and was practicing relaxation techniques and avoiding negative people at work. She continued to be overwhelmed and reported having thoughts of self-harm, but was able to refrain from cutting. Mental status exam revealed an irritable mood and an anxious affect. (Tr. 624-26).

Plaintiff presented to Dr. Aregood on March 16, 2016. Plaintiff still had symptoms of anxiety and depression. Dr. Aregood restarted Plaintiff on Vistaril for insomnia and made minor adjustments to her other medications. Plaintiff denied suicidal or homicidal ideations and felt like Cymbalta was helping her

mood. On mental status examination, Plaintiff's mood was down and worried. Her affect was constricted. (Tr. 842-46).

Plaintiff saw Ms. Epperson on April 6, 2016. Her affect was flat, dull, angry, and irritable. She reported abnormal sleep with sleep disruptions every night. Her concentration and attention decreased. She had thoughts of hurting "anyone who gets on my nerves" with a baseball bat and/or a "knife to the throat." She also had thoughts of suicide and was tearful during the session. On mental status examination, Plaintiff was irritable, anxious, sad, and tearful. (Tr. 838-41).

Plaintiff followed-up with Dr. Aregood on April 27, 2016. She continued to have chronic symptoms of depression, anxiety, and borderline personality disorder. Dr. Aregood adjusted Plaintiff's medications. Plaintiff had no suicidal or homicidal ideations and felt like Cymbalta was helping her mood. Dr. Aregood encouraged Plaintiff to continue therapy. On mental status examination, Plaintiff demonstrated impaired insight and judgment. (Tr. 829-33).

Plaintiff followed-up with Ms. Epperson on April 27, 2016. She experienced continued depression and anxiety symptoms. Plaintiff almost had a panic attack during the session because she was missing a $10 bill from her wallet. She began pacing the floor and making phone calls in an attempt to locate the money. Ms. Epperson noted that Plaintiff had poor planning skills and difficulties with problem solving. Plaintiff became tearful and stated she was going to "put herself in the hospital" because her medications were not working.

On mental status examination, Plaintiff was irritable, anxious, angry, hostile, sad, and tearful. She appeared agitated and oppositional. (Tr. 834-37).

Plaintiff saw Ms. Epperson on June 8, 2016. She appeared agitated, irritable, and anxious. Plaintiff reported continued symptoms of agitations and distress. She recently punched herself in the face on two occasions. She denied any suicidal intent, plan, and/or attempts or recent self-harming behaviors. (Tr. 869-71).

Plaintiff followed-up with Dr. Aregood on June 8, 2016 and continued to be troubled by chronic symptoms of depression, anxiety, and borderline personality disorder. Her mood was down and her insight and judgment were impaired. Her affect was anxious and constricted. Dr. Aregood made minor adjustments to Plaintiff's medications. (Tr. 872-75).

## Analysis

Plaintiff asserts, *inter alia*, that the ALJ misrepresented and mischaracterized the evidence related to her mental conditions. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 426 (7th Cir. 2010). This does not mean an ALJ must mention every piece of evidence. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). Rather, the ALJ cannot "ignore an entire line of evidence that is contrary to the ruling." *Id.*

The ALJ must also provide an accurate summary of the medical evidence. *See Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Otherwise, it is impossible to determine whether substantial evidence supports the decision.

The ALJ, here, provided a perfunctory and slanted summary of the medical evidence related to Plaintiff's depression, anxiety, and personality disorder. He ignored virtually all of the evidence that supported Plaintiff's allegations and highlighted the few instances where Plaintiff reported experiencing any kind of improvement in symptoms or demonstrated normal mental status examinations.

For instance, the ALJ noted, "Throughout the summer of 2015 [Plaintiff] indicated that with use of mediation [sic], she was controlling her mental health symptoms. On examination, she was cooperative and calm and maintained normal eye contact. Her speech was fluent and clear. Her mood was euthymic and her affect was pleasant and congruent to thought." (Tr. 20). As an initial matter, neither Plaintiff nor her treatment providers indicated Plaintiff was "controlling" her symptoms and the record certainly does not support this conclusion. From May 2015 through August 2015, Plaintiff reported frequent panic attacks, sleep disturbances, suicidal thoughts, mood swings, punching herself in the face, hitting her head against a wall, and contemplating committing herself to the hospital. (Tr. 533, 572-75, 576-77, 565-66, 660-62). Plaintiff's therapist and doctor also noted that Plaintiff's affect was tearful, flat, and sad during mental status examinations. (Tr. 562-64, 660-62). Plaintiff expressed that "she would like to no longer be here. . ." (Tr. 640-43). The ALJ, however, failed

to mention any of this evidence. Instead, he mentioned a single mental status examination that was not representative of the others from that period.

The ALJ also noted Plaintiff felt like Cymbalta was helping. However, he failed to mention that Plaintiff felt like some of her medication was not strong enough. (Tr. 539-43). "This sound-bite approach to record evaluation is an impermissible methodology for evaluating the evidence." *Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014).

The ALJ further opined, "Treatment records [from "early 2016"] indicated that contrary to her allegations, with use of medication, she had better control of her symptoms than she asserted." (Tr. 20). The record does not support this observation, either. In January 2016, Plaintiff stated things had been more difficult and she experienced an increase in symptoms. She reported episodes of self-harm. (Tr. 633-36). Although she had a decrease in panic attacks in February 2016, she continued to have thoughts of self-harm and a mental status examination revealed an anxious and irritable mood. (Tr. 624-26).

The ALJ also failed to acknowledge other portions of the record that corroborate the intensity of Plaintiff's symptoms resulting from her mental impairments. For instance, in September 2014, Dr. Gebauer noted Plaintiff's anxiety and depression were "very poorly controlled on a questionable regimen." (Tr. 719-22). Plaintiff demonstrated poor insight and judgment on a number of occasions during mental status examinations, (Tr. 474-77, 829-33, 872-75), along with irritability, anger, and hostility (Tr. 846, 624-26, 834-37, 838-41, 869-71).

In April 2016, Plaintiff had thoughts of hurting other people with a baseball bat or a "knife to the throat." (Tr. 838-41). She stated she wanted to commit herself to the hospital because her medications were not working. (Tr. 834-37).

As evidenced above, many of the ALJs conclusions are contrary to the evidence of record and/or the ALJ provided such a warped review of the record that it is impossible to tell whether his opinions rest on substantial evidence. Remand is necessary on this point, alone, so the Court will not address Plaintiff's remaining argument.

### Conclusion

The Commissioner's final decision denying Plaintiff's application for Disability Insurance Benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATE: July 23, 2018.**


**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**